Farewell, Mr. Bowman. We'll hear from you first. Good morning, and may it please the Court. My name is Matthew Bowman, and I represent the appellant, the School of the Ozarks, doing business as College of the Ozarks. On February 11th, the Department of Housing and Urban Development issued what it called this directive, and it said gender identity discrimination under the Fair Housing Act urgently requires enforcement action. It said, I am directing HUD's FHEO to fully enforce the Fair Housing Act to prohibit discrimination because of gender identity. It said all such bases shall be charged. It said state and local agencies' laws must, must and must include prohibitions on this discrimination. It said organizations and agencies that receive grants must include that discrimination, including through testing. And it said we will forge a path to the eradication of that discrimination. And then in the Federal Register, President Biden called this a rule change. But the District Court called this a non-binding general statement of policy. It dismissed our injunction request and all of our claims. That was legal error for three reasons. First, this directive has all the hallmarks of a legislative rule. Second, this directive restricts our speech, namely our statements about our biblically-based housing policies, including the way we address students and the pronouns we use with them in the dorms. And third, this Court has said that we need not wait for prosecution or actual enforcement before we seek judicial review. It has said that both in free speech cases and in administrative law cases, and this is both. Counsel, what's your best case for the, that we have spoken on the pre-enforcement ability of your clients here to proceed? You said that we've spoken on that issue, that you don't have to wait. I mean, what is your best case for that proposition? I would say both Telescope Media and Iowa League of Cities speak to this very strongly. Does it matter that Telescope is a state statute? And you've characterized this as a rule. The government characterizes this as a memorandum, maybe a directive. I don't know. But isn't there a distinction between a state statute that's clear on its face and an internal document, arguably, that directs investigation and assuming it's in, and I would assume it's in good faith, complying with a Supreme Court decision? Isn't there a distinction between a statute and Telescope and what we have here? If this directive is a legislative rule, there is no difference for the purpose of either pre-enforcement standing under the Free Speech Clause or judicial review under the Administrative Procedure Act for us to be able to challenge it because we have both substantive and procedural injury. So in the question of whether this is a legislative rule, Iowa League of Cities said that's a purely legal question. It's based on the four corners of the document and what the text says. There's no further factual development that's needed. And in American Farm Bureau Federation v. EPA, this court actually also faced a situation where a district court improperly went to the merits, dismissed on standing, but because the district court's ruling foreordained the merits question of whether this was a legislative rule, the court went on to say we're going to address that issue. We're going to deem it to be whether and we're going to decide whether it violates the Administrative Procedure Act. So to answer your question, Your Honor, I don't think the fact that there was a state statute in Telescope Media Matters, if this actually is a binding rule, and for all the reasons I think Iowa League of Cities shows, it actually is one. And personally, I don't think it's a difficult case. I respect the district courts wrestling with that issue. The government's main argument and the district court's main argument isn't actually that this rule isn't binding. Their argument just seems to be that Bostock made me do it, that Bostock sort of created the binding nature. And on the face of Bostock, that's simply not true. The court in Bostock went out of its way to say it was not ruling on the Fair Housing Act or any other statute and it was not ruling on intimate spaces. But when the Fair Housing Act governs housing in general, and in this case college dorms, it implicates both of those issues. Bostock said we're not touching that issue. So what the agency was doing here is it was not implementing an order from Bostock because Bostock didn't apply. It was extending Bostock to a different context. And if the agency wants to do that, it has to use rulemaking. It has to use notice and comment, which it didn't provide in this case. And it has to not do it in an arbitrary and capricious way by completely failing to consider important issues like the religious liberty of College of the Ozarks. And that's why when the telescope media said we need not wait for actual prosecution, when Iowa League of Cities said we do not require parties to operate beneath the sword of Damocles until the threatened harm actually befalls them. And if parties are faced with a choice of either immediately altering their behavior or playing an expensive game of Russian roulette, they can seek judicial review. And the Supreme Court said similar things in the Hawks and the Sackett case, which we discuss in our brief. This rule does have all the hallmarks of a legislative rule and Iowa League of Cities lists them and it really describes this rule in detail. It conclusively disposes of certain issues. It establishes the agency's position that this behavior should not be permitted. It prospectively restricts the agency's discretion. It eviscerates State discretion and insists that State and local authorities comply. Notably, we put in the record that the government, after this directive, sent out amendments to the grant conditions for States, showing that this was a new limitation. Otherwise, they wouldn't have had to amend the grant conditions. And so what this court said in Iowa League of Cities, I think, is a question that is answered in the positive here. Private parties are reasonably led to believe that failure to conform will bring adverse consequences, making the directive binding as a practical matter. That's Iowa League of Cities at 864. And I think this directive is binding as an explicit matter, in addition to being binding as a practical matter. The government at the district court also specified that it wants to be able to enforce this directive against our speech. The government's attorney said, quote, the college's views on sexuality could fall prey to violations of this directive and create, quote, a hostile housing environment. So that's us in our dorms saying we have this biblical view that men and women were created by God, and that's based on biology. And we're going to use pronouns in that way, and we're going to have a code of conduct. And biological men can't visit the women's living spaces and vice versa. And according to the government's attorney at the district court, this could violate the directive. And this is a reason, the government argued, why the directive shouldn't be enjoined. They want complaints to be filed against us, investigations to be opened, charges to be brought. And these are all reasons why we have standing under the Free Speech Clause as well as the Administrative Procedure Act. The government's other arguments also fall into what Iowa League of Cities called Orwellian Newspeak. Nothing in the directive indicates that it's going to be enforced based on limited circumstances. So in Iowa League of Cities, the court referred to letters from the EPA saying nothing about the proclamation indicates the agency's posture will vary based on circumstances. But what we have here is that as soon as judicial review was implicated, the government came in in court arguments and litigation and brought post hoc rationalizations. And they said, oh, well, maybe you'll be exempt under the Religious Freedom Restoration Act. Maybe we'll consider you exempt under a different statute, Title IX, even though we won't concede that either of those apply to you. We'll just create these potential future circumstances where this could apply to you. And Iowa League of Cities rejected that. It said hedging a concrete application of a policy within a disclaimer about hypothetical future contingencies cannot inoculate the agency from judicial review. And that's all we really have here in this case. Roberts. Counsel, is there, can there be separate standing under the Fair Housing Act? There can, Your Honor. You mentioned the Administrative Procedure Act. There can, Your Honor. The Fair Housing Act has a separate provision, which we discussed in our brief, that separate from the Administrative Procedure Act says that all regulations must be subject to notice and comment. And notably, in the Fair Housing Act, Congress did not say that there are exceptions to that. The Administrative Procedure Act has notice and comment exceptions for interpretive rules or policy rules, internal process rules. The Fair Housing Act does not. And so we have a distinct injury under the Fair Housing Act, even if this was deemed to be an interpretive rule instead of a legislative rule. I do think it has all the hallmarks of a legislative rule. But we have a distinct injury under the Fair Housing Act. And the government's response to that was, well, we think in 1974 Congress sub silencio incorporated the exceptions to the Administrative Procedure Act. Well, that turns the judicial presumption of notice and comment on its head. Congress went out of its way in this statute to say this is a sensitive area. Housing is a sensitive area. The agency is entitled to implement regulations, but it's got to subject them to notice and comment. And it's purely a, it's not disputed here. There was no notice and comment. And that's a pure legal issue. Counsel, would you address redressability? I mean, what is the injunction? What would it say if this panel were to decide today we're going to grant your motion for an injunction on appeal? What specifically would you want in that injunction? Well, the first thing we'd want is the directive, which is a final agency action. We would like it to be enjoined and held to be unlawful under the Administrative Procedure Act. Well, what does that mean? I mean, it's a, would that prohibit, would that prohibit the agency from investigating same-sex discrimination or complaints received related to same-sex discrimination? It might not. Standing on its own. Well, that seems to be critical to me as far as standing goes. The third, you know, you're asking us to enjoin and we're arguing about what the document is. But it seems for standing you have to tell us what you want us to do. And that's where I'm kind of getting stuck. We enjoin a memo. You know, the Attorney General still has the ability, I think, to pursue these cases. Private parties have the ability to pursue these cases. And the Attorney General certainly retains the ability to argue that Bostock requires a policy along these lines. So what changes if we act today? Well, we want the directive enjoined. We also want enforcement of this theory enjoined. But even if only the directive. Enforcement of the theory. I mean, what's the closest case where you can find where we've enjoined enforcement of a legal theory? Well, I think the free speech cases and telescope media get there. Because what we have is the agency violating constitutional right and exceeding its statutory authority. But I do want to address. But doesn't it, I mean, telescope media was on the face of the state statute, wasn't it, that prohibited the conduct that was being challenged. Here we have a memorandum. It seems to me that's different. And I know I'm going back to a question that I circled around last time. But it seems to me redressability is a really tough call here, given the nature of the directive, memorandum, legislative rule, whatever you want to call it. I think that whatever you call it drives a lot of that thought, Your Honor. Because if this is a legislative rule, what we have is the agency issuing a rule. An agency rule binds private parties. It tells them they're under this sort of Damocles. They have to change their behavior or they risk racking up liability. They risk things like being found willfully in violation instead of just being found in violation. And so that's why the Administrative Procedure Act says that agencies can't issue rules. And the vacatur of a rule or the holding unlawful of a rule, that in itself provides a remedy. That's a benefit to the regulated community. Moreover, the procedural injury that we suffered is a separate injury that we benefit from by holding this unlawful. Because that procedural injury, which the court acknowledged in Iowa League of Cities, is that we have a right as part of the regulated community, which the government concedes we are, to submit public comment before a rule comes out. Because once we submit public comment, the APA requires the agency to respond to subsequent substantive comments. And if it doesn't, that rule gets struck down again as arbitrary and capricious. So, for example, we would have submitted comments saying this violates our religious liberty. This violates our free speech. It's inconsistent with Title IX. And they would have had to respond to that if they had issued a rule. They probably would have had to, at minimum, create exceptions. If they didn't, it would have been subject to judicial review. We lost all of that. That procedural injury and the cure of it by holding this directive unlawful gives us redressability. Now, the Supreme Court said in the Church of Scientology case that a partial remedy is sufficient for redressability. So the government argues, well, even if this directive in our enforcement isn't joined, private parties could still sue you. Well, okay, but we still get the benefit of having this rule not be on the books. The regulated community is not now facing this requirement. Now, we do also ask the court to reach the question under the free speech clause, that the government cannot satisfy a compelling interest to tell us that the way we have our dorms set up and the way we speak to our students in those dorms about our biblically-based views of sexuality can be restrained by the Fair Housing Act and its regulations. Counsel, let me go back to the redressability question. As I understand your argument, the key here is whether we determine that this is a rule or even a significant guidance document under the Fair Housing Act. And if we reach that determination, then it would be enjoined just like any other rule that had not gone through the proper comment and notice process. That's right, Your Honor. And that would redress both our procedural injury, which is a freestanding injury for being denied notice and comment, and it would redress the substantive burdens that agencies face when they're under this sort of Damocles. We're racking up violations exponentially every day in the government's view, because we can't stop operating our college according to our biblically-based views, and yet the government in this directive declared that it would already be retroactive one year. So not being under that is something that gives us a benefit, but we do think the court should also reach the question that this violates the free speech clause and the Fair Housing Act does not actually, in prohibiting sex discrimination, it does not actually empower the agency to tell us that we have to let men who identify as women into the women's dorms and vice versa. And therefore, beyond the directive, even if the agency were to try to enforce the notion that it can prohibit gender identity discrimination in our dorms, that would be in excess of its statutory authority under the APA, and it would be contrary to constitutional right. Unless you have other questions now, Your Honor, I reserve my time for rebuttal. Thank you. Thank you. Thank you. All right. Ms. Marcus, we'll hear from you. Thank you, Your Honor. I'm Stephanie Marcus from the Department of Justice, and with me at council table is Charles Thomas from the U.S. Attorney's Office, and we represent police. In this case, the district court properly dismissed the college's complaint for lack of subject matter jurisdiction. And as the district court recognized, the February 2021 HUD memorandum that plaintiff challenges does not require a plaintiff or any other housing provider to do or refrain from doing anything. And for that reason, there is a difference, Your Honor, between the state statutes at issue in Telescope Media and some of the other eight circuit cases, because here the memorandum is not binding on regulated parties or the courts at all. It doesn't purport to define when any party would or would not be liable under the Fair Housing Act. It simply is reaffirming HUD policy of accepting and investigating complaints of gender identity and sexual orientation discrimination. But there is language in the memo that suggests a change, isn't it? How would you describe that? I mean, there's language in there about eradicating, suggesting that previous activities have been insufficient, incorporating Bostock as a new source of authority for what you might suggest would be expanded enforcement. I mean, it's not just a, hey, let's focus on this or let's make sure we're doing this. There's a lot of language, especially at the beginning of that memo, that seems to chart a new course. Well, Your Honor, the memo is connecting that prior policy and saying that it is bolstered by the Bostock decision. The Bostock decision addressed substantially identical statutory text, and HUD is informing its own enforcement agencies that, hey, here's the Supreme Court decision. It says this. And with respect to enforcement, an agency's decisions on enforcement priorities are not reviewable under HUD-granted attainees. Those, yes, it does mention enforcement and emphasizes enforcement. But in the text of the memo itself, the instruction is to accept for filing and investigate. There is no substantive legal standard in that memorandum about liability. And it's that so in that way it is an enforcement instruction to its own, HUD's own enforcement agency. This is something HUD could have done internally, but it did it publicly. And that's a benefit to the public to know what the agency's interpretation is. And the agency is just saying in a nonbinding way on either courts or regulated parties what its view of the law is. Sotomayor, if it was nonbinding, why was it publicly characterized as a rule? Your Honor, it was not publicly characterized as a rule by the agency itself. President Biden, in a proclamation on fair housing, it's in the record and it's just in passing. He didn't even mention the directive or memorandum he talked about or rule change. That kind of informal comment, it can't characterize the memorandum legally as a rule. So if it's not a rule, isn't it at least a significant guidance document under the Fair Housing Act? Your Honor, that is not, and again, we think again that the plaintiffs don't have standing and should not be reaching the merits of this. Well, but as I understand it, the Fair Housing Act requires notice and comment for significant guidance documents separate and apart from the APA. But again, I mean, plaintiffs don't have any injury here, so we, so they don't need to reach that. Lack of comment would not be an injury? Not if they don't have any, not here. They have not shown that HUD has ever enforced the Fair Housing Act against a private religious college. So are you suggesting that you need a substantive injury in addition to a procedural injury for standing? Yes, the procedural injury cases assume a substantive legislative rule. And that's the backdrop for the Lujan quote. It assumes that there is a final agency action. And, Your Honor, though, to answer your question, no, it is not. It does not require notice and comment under the Fair Housing Act either, if you were to reach the merits. And that is not something determined by plaintiff, whether it's, the Fair Housing Act itself does not, the notice and comment requirements don't apply to statements of policy. And even, and it's the agency determines what, you know, would or would not, in terms of guidance documents, require notice and comment. And I think the regulations, I think we, as we say in our brief, the regulations that they have relied on have since been reviewed. And we, I would like to say in response to Mr. Bowman, there is about, he was emphasizing, and the college emphasized in the brief this idea that this is binding on, you know, HUD's enforcement agencies. First, we do want to reiterate, as we said in our brief, that the state and local agencies and FHIP organizations aren't at issue here. None of them operate where the college is. It would just be HUD's own enforcement agency. But, for example, in Summers v. Earth Island Institute, the Supreme Court held that the standards and procedure, there were regulations under challenge, but the court pointed out that the standards and procedures that they prescribed for Forest Service appeals govern only the conduct of Forest Service officials, not the regulated parties. It does make a difference. What's the most relevant is whether it imposes any kind of obligation. And here, it does not. And, indeed, the college has made clear in its complaint that it has not been chilled. It is continuing to, it continues to have the same policies it's always had. But it is incurring day-by-day significant potential liability. Wouldn't you agree? Your Honor, here, they just don't have a credible threat of prosecution because if you look at the history of the Fair Housing Act, there's very little Fair Housing Act activity about colleges at all, though the journals are subject to the Fair Housing Act. And in its history, HUD has never enforced the act against a private religious college-like plaintiff that has a Title IX exemption for its housing. Of course, I mean, most of that predated Bostock, which now the agency is grabbing onto, and as I suggest, in good faith. But I'm wondering, doesn't that change, I mean, otherwise, what's the purpose for releasing the memo? Your Honor, the memo, again, is that it's a public document to let both HUD's own enforcement agencies and the public know what the agency's view of the law is, according to a recent Supreme Court opinion. But it also, remember that the vast majority of Fair Housing Act enforcement is not about religious entities or about colleges. It's, you know, private landlords and apartment complexes, cities, public entities. It's not... But of course, the agency has been enforcing same-sex discrimination in that area for years. And the agency has, again, we have pointed out since 2009, it's had guidance saying that the same, basically the same thing the memorandum does, except that it's been altered by a Supreme Court case now. So why then was it urgent and immediate, as the memo says? As the memo said, I think that because there, you know, prior to Bostock, there was uncertainty about the legal interpretation of that text, about what that encompasses. And HUD wanted to ensure that, you know, it's fully enforcing the law. You mean the text of Title VII? Title VII, yes, but that is actually materially identical to the Fair Housing Act. Although Bostock said it was limited to Title VII. Yes, Bostock did. And again, the memorandums and HUD's view, which we think is correct, but it is not binding on the court. The court does not need to reach that in this case. HUD's not asking for deference to the memorandum. And the Bostock limitations are actually equally applicable to the memorandum. The memorandum is essentially doing for the Fair Housing Act what Bostock was saying about Title VII. Look, we have this language. This is what we think it means. It's not binding on regulated parties or on the court, but this is what the agency believes it means based on materially identical text. How would a regulated entity know that it was nonbinding, given the language of the memorandum? The language of the memorandum is directed to housing enforcement agencies, not to regulated parties. That's their regulator. That is their regulator, and it is making regulated parties aware of the agency interpretation, which we think is a good thing. Again, HUD could have done this internally, and we actually think it's better for the Has the agency reached an interpretation of whether or not there are religious exceptions to the Fair Housing Act following Bostock? Your Honor, the agency has not reached a determination with respect to any specific religious exception. However, the agency has said, as set forth in a brief, that it will consider religious defenses in any complaint that it's investigating, including at the investigation stage when it's determining, before it even determines whether or not to make a charge. It will consider First Amendment. It will consider FERFRA. It will consider how the Title IX exemption interacts with the Fair Housing Act. Yes, it's an exemption under Title IX, not the Fair Housing Act, but, you know, those are two significant federal statutes that, if it were in the context of a college, would be something for the agency to consider. So those are all, and that's why we also argue in the alternative to standing, the case also is not right. And that's a big difference between some of the cases that the college relies on, where you have a plaintiff saying, essentially, this is how I want to exercise my rights, and this is your state statute that arguably prohibits that. We don't have a set of facts here. It's all hypothetical, and there hasn't been a complaint filed by any individual or by HUD. And in the history of the FHA, against plaintiff or any other private religious college covered by a Title IX exemption. And that's the best of, as you know at this point, there's no complaints against educational institutions. Under the Fair Housing Act. Under the Fair Housing Act. That's to the best of my knowledge. So under that, so for those reasons, we think that this would work correctly to determine that it lacked subject matter jurisdiction. And unless there are further questions, we would ask that you affirm this report. Very well. Thank you. Thank you, Mr. Gardner. Thank you. We'll hear from you, Rebuttal, Mr. Bowman. Thank you, Judge Palatin. The government conceded that dorms are subject to the Fair Housing Act. Now it says that HUD will consider religious defenses, but the directive doesn't say that. The directive doesn't say anything about religious defenses. When an agency issues a rule. I did have one question on that point. Bostock, you know, has a fairly long section at the end about religious liberty and the deep concern that the court has with preserving the promise of free exercise of religion. And it comments about how doctrines protecting religious liberty, how they interact with the anti-discrimination law would be a question for future cases. If the agency is incorporating Bostock, wouldn't it be incorporating that discussion too? Whether and to what extent it's incorporating Bostock ought to be discussed in the rule. And since it's not discussed in the rule, what we have is that private parties are reasonably led to believe that failure to conform will bring adverse consequences. The APA's requirement that agencies consider all substantive issues in That's a requirement that is intended to protect regulated entities from being under this sort of Damocles that an agency puts them under when it issues a rule and it deprives them of the opportunity for notice and comment. All agency rules set forth substantive standards and then they give general directions for enforcement. And the government's theory seems to be that, well, unless the rule is formally can't be challenged under the APA. That's not correct. What is it that's new in the rule as far as enforcement goes? Well, the rule itself admits that the whole thing is new. It says that everything prior on gender identity discrimination was limited, insufficient, inconsistent, and failed to fully enforce the provisions of the Fair Housing Act. But that could be a failure to enforce existing law. In other words, what is the new rulemaking here? Because to the extent that it's enforced, you know, just refocusing, I don't think we have any ability to question that. Is it just the inclusion of Vostok and then the assumption that the government will not honor what Judge Colleton referred to and that is the last sections of that opinion? No, Your Honor. The Fair Housing Act has regulations and they say here's the discrimination that's prohibited, sex, race, et cetera. This is essentially a rule that adds gender identity and sexual orientation to the regulation. But it didn't go through rulemaking. Now, if the agency had done that. Well, hasn't the agency been pursuing investigations related to same-sex discrimination prior to this memo or am I misunderstanding the record? It has not done so much. And, in fact, in 2020, HUD said that the Fair Housing Act doesn't prohibit gender identity and sexual orientation discrimination. So the agency has been all over the map about this. It wasn't until February 2021 that it said this is an absolute rule. We're going to demand full enforcement. We're going to apply it to external entities. Now, if the agencies could say I'm not regulating the regulated community, I'm just ordering enforcers to enforce a rule against the regulated community and inoculate itself from judicial review by that mechanism, then that would be a formality which would eliminate all judicial review. It's inconsistent with the presumption of judicial review that exists under the Administrative Procedure Act. But if an agency issues a binding standard, it has all those hallmarks of a legislative rule we went through and described in Iowa League of Cities comparing line by line with the directive. There are no qualifications in the directive. All the qualifications came in the subsequent litigation, which the Supreme Court says is an impermissible post hoc rationalization. That leads to this being a legislative rule and we believe we're entitled to judgment from this court. Thank you. Thank you. Thank you to both counsel for your arguments. The case is submitted. The court will file a decision in due course.